**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

**THOMAS HAYNES, JR. (#308610)**                    **CIVIL ACTION**

**VERSUS**

**BURL CAIN, WARDEN**                                     **NO. 11-0202-SDD-RLB**

<u>**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**</u>

This matter comes before the Court on the petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The State has filed a response in opposition to the petitioner's application, and the petitioner has responded to the State's Opposition. There is no need for oral argument or for an evidentiary hearing.

The petitioner, Thomas Haynes, Jr., challenges his convictions, entered in 2003 in the Nineteenth Judicial District for the Parish of East Baton Rouge, State of Louisiana, on two counts of attempted second degree murder and one count of being a felon in possession of a firearm. The petitioner contends (1) that he was provided with ineffective assistance of counsel in numerous respects, (2) that he was denied the right to a fair trial when the trial court denied a motion to sever the felon-in-possession charge from the other two charges, and (3) that the evidence was insufficient to support the verdicts. In addition, the petitioner has filed a Supplement to his application wherein he seeks to assert an additional claim that the Bill of Information which charged him with commission of the referenced offenses was fatally defective as to Count Two thereof, thereby depriving the state trial court of jurisdiction to adjudicate his guilt in connection with that offense.

Upon a review of the petitioner's application, it appears that the petitioner was charged, by Felony Bill of Information filed in August, 2002, with two counts of attempted second degree murder and one count of being a felon in possession of a firearm.  Through his attorney, the petitioner filed a Motion to Sever the trial of the felon-in-possession charge from that of the other two counts.  After a hearing conducted on February 12, 2003, the trial court denied the petitioner's motion.  A jury trial then commenced on February 18, 2003, after which the petitioner was convicted on all three counts.  He thereafter filed motions for a new trial and for post-verdict judgment of acquittal, asserting that the verdicts were contrary to the law and evidence, that the trial court committed reversible error in denying the motion to sever, and that the evidence was insufficient to support the verdict.  After a hearing conducted on April 25, 2003, the trial court denied the referenced motions.  Upon thereafter determining that the petitioner was a second felony offender, the trial judge sentenced the petitioner, on May 16, 2003, to sixty-six (66) years in confinement in connection with the first count of attempted second degree murder (as enhanced by the multiple offender adjudication), to fifty (50) years in confinement in connection with the second such count, and to fifteen (15) years in confinement in connection with the felon-in-possession conviction, with these sentences to be served concurrently and without the benefit of probation, parole or suspension of sentence.  A Motion to Reconsider the Sentence was thereafter filed, which Motion was denied by the trial court on August 13, 2003.

The petitioner appealed his convictions, asserting that the trial court erred in denying his motion to sever, motion for new trial and motion for post-verdict judgment of acquittal.  On June 25, 2004, the Louisiana Court of Appeal for the First Circuit affirmed the convictions and

sentences and also *sua sponte* amended the felon-in-possession sentence to include the imposition of a fine in the amount of $5,000.00.  *See State v. Haynes*, 876 So.2d 969 (La. App. 1ˢᵗ Cir. 2004).  The petitioner thereafter sought writs before the Louisiana Supreme Court, which Court granted review, in part, on December 10, 2004, reversing the imposition of the referenced fine but otherwise denying review in connection with the convictions and sentences.  The Supreme Court then remanded the matter to the trial court for re-sentencing in connection with the referenced fine and felon-in-possession count.  *See State v. Haynes*, 889 So.2d 224 (La. 2004).

The petitioner thereafter filed in the state trial court, on or about January 26, 2005, a "Motion for New Trial" and a "Motion to Vacate and Correct an Illegal Sentence."  After a hearing conducted on May 13, 2005, the trial court denied these motions and re-sentenced the petitioner in connection with the felon-in-possession charge, imposing a fine in the amount of $5,000.00.  It does not appear that the petitioner sought further direct review by appealing the new sentence.  Accordingly, his convictions and sentences became final thirty days later on June 12, 2005, upon passage of the time allowed for him to pursue an appeal.  It does appear, however, that the petitioner filed an application for supervisory review in the state appellate court relative to the denial of his "Motion to Vacate and Correct an Illegal Sentence."  Upon denial of review in the intermediate appellate court on August 8, 2005, the petitioner sought further review in the Louisiana Supreme Court, which Court denied review on June 23, 2006. *See State ex rel. Haynes v. State*, 930 So.2d 967 (La. 2006).

While the petitioner's application for supervisory review was pending before the Louisiana Supreme Court in connection with his Motion to Vacate and Correct an Illegal

Sentence, the petitioner filed an application for post-conviction relief in the state trial court on March 7, 2006,[1] asserting that he was provided with ineffective assistance of counsel at trial because his attorneys (1) failed to offer evidence in support of the motion to sever, failed to file a writ application in the appellate court upon denial of the motion to sever, and failed to object to the State's use of the petitioner's prior conviction for purposes other than to establish his status as a prior felony offender, (2) failed to investigate whether evidence was seized by law enforcement officials or was otherwise available for forensic testing which could have excluded the petitioner as perpetrator of the offenses, (3) failed to file a motion to suppress the in-court identification of the petitioner by a witness, (4) failed to object to evidence regarding an unrelated weapon and ammunition found in the vehicle allegedly involved in the offense, (5) failed to object to the use of an AK-47 rifle as demonstrative evidence, and (6) failed to object to the State's use of the petitioner's prior conviction both the support the felon-in-possession conviction and to support the multiple offender adjudication.  Pursuant to motion filed by the petitioner, he was allowed to add an additional claim of alleged ineffective assistance stemming from the asserted failure of his attorneys to move for or accept a mistrial after members of the jury observed the petitioner in handcuffs and shackles during a recess in the trial.  In addition, the petitioner filed an additional supplemental memorandum in September, 2009, wherein he sought to assert the claim that Count Two of the Felony Bill of Information was defectively

---

1. Although the petitioner's application for post-conviction relief was docketed as filed in the state trial court on March 17, 2006, the Court will apply the "mailbox rule" articulated in *Houston v. Lack*, 487 U.S. 266, 271 (1988), pursuant to which an inmate petitioner is deemed to have filed his habeas corpus pleading on the date that he places it in the prison mail system for submission to the court and not the date that it is ultimately docketed by the receiving court. Accordingly, inasmuch as the petitioner signed his state court application for post-conviction relief on March 7, 2006, the Court will utilize that date as the date of the petitioner's filing.

vague inasmuch as it failed to identify the purported victim of the offense charged.  The trial court thereafter denied the petitioner's PCR application on December 28, 2009, and the petitioner sought supervisory review in the state appellate courts, which courts denied relief on April 26, 2010, and February 4, 2011, respectively.  *See State v. Haynes*, 56 So3d 989 (La. 2011).

Finally, on or about February 9, 2011, the petitioner filed the instant application for habeas corpus relief in this Court.[2]

## Legal Analysis

The standard of review in this Court for evaluation of the petitioner's claims is that set forth in 28 U.S.C. § 2254.  Specifically relevant is 28 U.S.C. § 2254(d)(1), which provides that an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Relief is authorized if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  Relief is also available if the state court identifies the correct legal principle but unreasonably applies that principle to the facts of the prisoner's case or reaches a decision based on an unreasonable factual determination.  *See* 28 U.S.C. § 2254(d)(1)-(2); *Montoya v.*

---

2.  The petitioner's application is signed February 9, 2011, but was received by this Court on March 28, 2011.  *See* note 1, *supra.*

*Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).  Mere error by the state court or this Court's

disagreement with the state court is not enough: The standard is one of objective reasonableness.

*Id.  See also Williams v. Taylor, supra*, 529 U.S. at 409 ("[A] federal habeas court making the

'unreasonable application' inquiry should ask whether the state court's application of clearly

established federal law was objectively unreasonable").  State court determinations of underlying

factual issues are presumed correct, and the petitioner has the burden to rebut the presumption

with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

     The State contends that, applying this standard to the petitioner's claims, there is no basis

for the granting of habeas relief.

The Petitioner's Claim Regarding The Alleged<br>
<u>Ineffectiveness of Trial Counsel is Without Merit</u>

     The petitioner first asserts that he was provided with ineffective assistance of counsel in

numerous respects.  A habeas petitioner who asserts that he was provided with ineffective

assistance of counsel must affirmatively demonstrate (1) that his counsel's performance was

"deficient", *i.e.*, that counsel made errors so serious that counsel was not functioning as the

"counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient

performance prejudiced his defense, *i.e.*, that counsel"s errors were so serious as to deprive the

defendant of a fair trial, a trial in which the result is reliable.  *Strickland v. Washington*, 466 U.S.

668, 687 (1984).  The petitioner must make both showings in order to obtain habeas relief based

upon the alleged ineffective assistance of counsel.  *Id.*

     To satisfy the deficiency prong of the *Strickland* standard, the petitioner must

demonstrate that his counsel's representation fell below an objective standard of reasonableness

as measured by prevailing professional standards.  *See, e.g., Martin v. McCotter*, 796 F.2d 813,

6

816 (5th Cir. 1986).  The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy.  *See, e.g., Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).  This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.  *Martin v. McCotter, supra*, 796 F.2d at 817.  Great deference is given to counsel's exercise of professional judgment.  *Bridge v. Lynaugh, supra*, 838 F.2d at 773; *Martin v. McCotter, supra*, 796 F.2d at 816.

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice resulting from the alleged errors.  *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988).  To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding.  *Strickland v. Washington, supra*, 466 U.S. at 693.  Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.  *Martin v. McCotter, supra*, 796 F.2d at 816.  The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome."  *Id.* at 816-17.

As discussed below, the above showing is one that the petitioner cannot meet in the instant case.

A.      *Failure To Move To Quash Count Two Of The Bill Of Information As Fatally Defective.*[3]

The petitioner first contends that his trial attorneys provided ineffective assistance by failing to challenge the Felony Bill of Information in this case as being fatally defective relative to Count Two thereof because it failed to adequately identify a purported victim of the charged offense.  Specifically, the petitioner notes that the Bill of Information states as to Count Two that "on or about June 22, 2002, he attempted to commit second degree murder of the *inhabitants* of 5659 Nashville Drive in Baton Rouge, Louisiana."  (Emphasis added).

This contention must be rejected.  The sufficiency of a state indictment or bill of information is not a matter for federal habeas corpus relief unless it can be shown that the charging document is so defective that the convicting court had no jurisdiction.  *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985).  A claim of the insufficiency of a bill of information is reviewable for federal habeas purposes only when the bill of information is so defective that under no circumstances could a valid state conviction result from the facts provable thereunder.  Such a determination can only be made by looking to the law of the state where the bill of

_____

3.  This Court has previously ruled that the petitioner has voluntarily withdrawn this claim and that he did so in a pleading filed in response to the State's argument, in its initial response to the petitioner's application, that the petitioner had failed to exhaust state court remedies relative to this claim as mandated by 28 U.S.C. § 2254(b)(1)(A).  *See* Rec. Docs. 8, 11 and 12.  Notwithstanding, a review of the complete state court record that is now available reflects that the petitioner may in fact have supplemented his state post-conviction claims in state court by adding this claim.  Specifically, it appears that a claim regarding the alleged defectiveness of the indictment was asserted in a supplemental memorandum filed in support of the petitioner's PCR application in September, 2009, and that the trial court considered the supplemental memorandum in denying the petitioner's PCR application.  Further, it appears that a subsequent writ application filed by the petitioner in the Louisiana Supreme Court also included the referenced claim.  Further, none of the state courts explicitly denied consideration of this claim on procedural grounds.  Accordingly, although this Court considers the instant claim to have been voluntarily abandoned in fact, the Court will nonetheless address the claim out of an abundance of caution.

information was issued.  *Id.*  In this regard, the Louisiana Code of Criminal Procedure provides that "[t]he indictment shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  La. Code Crim. P. art. 464.  The referenced article further provides that an indictment shall cite the relevant statute which the defendant is alleged to have violated, but that error in this citation or even failure to do so will not render the indictment invalid.  *Id.*  Moreover, it is not essential that the date, time or place of the offense be stated with particularity.  La. Code Crim. P. arts. 468-69.  In providing the identification of the victim, when an offense is committed against a person, the indictment "shall state the true name of the victim," but if the name is not known, "may describe him as far as possible."  La. Code Crim. P. art. 473.  The Official Comments to this article note that a primary concern in identifying a victim is "protection of the defendant's constitutional right to be informed of the nature and cause of the accusation against him, and with requiring a description of the injured party ... adequate to support a plea of double jeopardy."  In addition, the Comments note that this article "stresses 'identification,' rather than a mere naming of the victim," and so permits a "description" under certain circumstances.  Finally, a bill of particulars may be requested by either the defendant or by the trial court so as to provide "more specifically the nature and cause of the charge."  La. Code Crim. P. art. 484.  *See also State v. Liner*, 373 So.2d 121, 122 (La. 1979) (recognizing the validity of Louisiana's short form indictment).

In the instant case, the Felony Bill of Information made reference to the date and place of the charged offense and to the pertinent statutes that the petitioner was charged with having violated.  The petitioner complains, however, that the failure to name a specific intended victim or victims rendered the charging document constitutionally defective.  This Court does not agree.

9

At a preliminary hearing conducted on October 24, 2002, testimony was presented by the investigating sheriff's detective which fully advised the petitioner and his attorneys of the factual basis for the charges made against him, so as to inform him "of the nature and cause of the accusation" and to allow him to defend against those charges.  Rec. Vol. 1, p. 168, *et seq.* Further, although Louisiana law requires that an offender have had a specific intent to kill in order to support a conviction for attempted murder, "[t]he law does not require that the intent to kill be of a specific victim, but only that the defendant had the intent to kill *someone*."  *State v. Dubroc*, 755 So.2d 297, 303 (La. App. 3d Cir. 1999) (emphasis added).  *See also State v. LeBlanc*, 719 So.2d 592, 596-97 (La. App. 4th Cir. 1998) (upholding attempted murder conviction where the defendant fired four to six shots at the occupants of a vehicle); *State v. Hall*, 606 So.2d 972, 976 (La. App. 3d Cir. 1992), *writ denied*, 644 So.2d 385 (La. 1994) (upholding attempted murder conviction where the defendant shot in the direction of two people, hitting both); *State v. Coleman*, 432 So.2d 323, 325 (La. App. 1st Cir. 1983) (upholding attempted murder conviction where the defendant fired six shots at a vehicle).

Based on the foregoing and on the evidence adduced at trial, which reflected that the petitioner fired numerous shots into a residence which he knew to be occupied and in which a person resided with whom the petitioner had been involved in an altercation earlier that evening, it appears that the Bill of Information, which charged him with attempting to kill one or more of the inhabitants of that residence, sets forth with sufficient clarity and particularity the identity of the persons that the petitioner intended to kill, the date of the offense, and the pertinent statute. This Court, therefore, sees no deficiency in the Bill of Information, and any challenge thereto by the petitioner's attorney would have been rejected as being without merit.  *See Tarver v. Cain*,

2007 WL 677171, *9 (W.D. La. Feb. 2, 2007) (finding no ineffective assistance of counsel

where attorney did not move to quash an indictment which identified the victims as unnamed

juveniles); *Bergeron v. Cain,* 2006 WL 2947920, *8 (E.D. La. Oct. 13, 2006) (same, where

indictment identified the victim only as "a child under the age of 12 years").  Moreover, the

petitioner is unable to show any prejudice resulting from the failure to move to quash the Bill of

Information.  Had his attorneys succeeded in having the Bill of Information quashed, there is no

reason to suggest that the State would not simply have amended the charging document to cure

the noted deficiency, thereby achieving, if anything, only a delay in the trial.  *See Tarver v. Cain,*

*supra, 2007 WL 677171* at *10, *citing Pickney v. Cain*, 337 F.3d 542, 545 (5th Cir. 2003).

Accordingly, there was no deficiency in the failure of the petitioner's attorneys to challenge the

Bill of Information in this case, and this claim is without merit.

B.      *Failure To Investigate Crucial Evidence And Witnesses.*

        In this assignment, the petitioner complains of his attorneys' failure to more rigorously

pursue information regarding potential forensic testing of the person or clothing of the petitioner

and his purported accomplice, Herbert Sanders, for gunpowder residue, the presence or absence

of which may have been beneficial to the defense.  In this regard, at the preliminary hearing

conducted in October, 2002, the petitioner's attorneys questioned the investigating sheriff's

detective concerning whether any physical evidence had been discovered which connected the

petitioner to the scene of the crime or to the charged offenses.  Specifically, the petitioner's

attorneys questioned the detective as to whether any gunpowder residue testing had been

undertaken, to which question the witness responded in the negative.  State Record, Vol. I at p.

187.  Upon further questioning, the witness stated that one reason for the failure to perform

gunpowder residue testing was because the sheriff's office did not "do those tests anymore," specifically because the "state police crime lab does not do them any anymore." *Id.* According to the petitioner, however, this statement was inaccurate, and he points to copies of newspaper articles and other documentation that he asserts reflect that such testing has been undertaken in criminal cases in this jurisdiction. *See* Rec. Doc. 3-2 at pp. 75-97. The petitioner asserts, therefore, that his attorneys were ineffective when they failed to undertake further investigation to establish the falsity of the witness' statement and the potential availability of gunpowder residue testing.

A petitioner who alleges a failure to investigate on the part of counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998). A petitioner cannot show prejudice with respect to a claim that counsel failed to investigate without adducing what the investigation would have shown. *Diaz v. Quarterman*, 239 Fed. Appx. 886, 890 (5th Cir. 2007). The petitioner cannot meet this test in this case. Instead, he merely speculates that had he and/or his purported accomplice been tested for the presence or absence of gunpowder residue, or had items of their clothing been obtained by law enforcement officers and been tested, then the results of those tests may have resulted in evidence that was favorable to the defense. This sort of speculation, however, is not sufficient to establish deficient performance on the part of his attorneys. *See Moawad v. Anderson, supra,* 143 F.3d at 948 (rejecting a claim of alleged deficient performance for failure to test for "powder burns" where the petitioner "merely asserts that there might have been powder burns"). Moreover, it is more likely that the petitioner's attorneys made the reasonable strategic decision not to undertake gunpowder residue

testing or to engage in further investigation because such testing may have resulted in evidence that in fact incriminated the petitioner as the person who committed the charged offenses. *See id.* (recognizing that the results of gun powder testing could have discredited the petitioner's defense in that case).   Thus, it appears that the petitioner's attorneys, as a matter of sound trial strategy, decided instead "to cross-examine the state's witnesses ... regarding the lack of tests for gunshot residue – in an attempt to create reasonable doubt in the jury's minds during deliberations." *See Kitchens v. Caskey*, 2011 WL 5117791, *8 (E.D. Miss. Oct. 25, 2011). *See also Chandler v. Marshall County Correctional Center*, 2010 WL 3717231, *4-5 (N. D. Miss. Sept. 14, 2010) (noting that gunpowder testing may have resulted in evidence unfavorable to the petitioner and that failure to pursue further testing was not deficient performance); *James v. Director, TDCJ-CID*, 2009 WL 484987, *3 (E.D. Tex. Feb. 26, 2009) (rejecting a petitioner's argument regarding the failure to undertake gunpowder residue testing as speculative).   On this showing, therefore, the petitioner's claim must fail.

C.   *Failure To Offer Evidence In Support Of The Motion To Sever; Failure To File A Writ Application Upon Denial Of The Motion To Sever; And Failure To Object To The Purported Use Of The Petitioner's Prior Felony Conviction For Purposes Other Than to Support The Felon-In-Possession Charge.*

In this claim, the petitioner asserts that, at a hearing held prior to trial on his Motion to Sever, his attorneys presented argument but did not introduce any evidence to support their assertions relative to potential prejudice resulting from the joinder of the felon-in-possession count with the two attempted murder counts.   According to the petitioner, his attorneys should have presented testimony from the two victims of the shootings and from the petitioner's purported accomplice to show that the State's case against him was very weak and that, as a result, the joinder of the felon-in-possession charge would necessarily result in prejudice.   This

13

claim is without merit. The petitioner's attorneys effectively informed the trial judge of the factual weaknesses in the State's case during argument on the Motion to Sever, and the State did not materially dispute the assertions made in this regard. Specifically, the petitioner's attorneys argued to the court:

> The case against the defendant on the attempted second degree murder is extremely weak. We had a preliminary examination, and in that examination the State showed that they had no physical evidence at all linking the defendant to this particular shooting. There was no gun that was recovered, no fingerprints linking him to the scene. The only thing that the State produced was a co-defendant who was identified by one of the victims who said that the defendant, Thomas Haynes, was with him and was the actual person who fired the gun. That individual the state revealed to us at the last hearing ... has been offered, or will be offered probation by the State if he testifies against our client. Therefore, your Honor, the whole case against the defendant is based on this one co-defendant who is now charged with second degree murder and is going to be offered probation.... If the State is allowed to proceed with both charges, and the jury is allowed to hear that this young man has a prior conviction, we feel that that would end up giving the State an unfair advantage and would prejudice the defendant.

State Record, Vol. 1 at pp. 194-95. Accordingly, inasmuch as the presentation of evidence at the referenced hearing would have done little more than confirm the undisputed assertions made by counsel as to the alleged factual weaknesses in the State's case, the Court sees no deficiency in the failure to offer such evidence.

Nor does this Court find deficient performance in the failure of the petitioner's attorneys to seek supervisory appellate review prior to trial in connection with the denial of the Motion to Sever. It is entirely speculative whether such review would have been granted by the appellate court and whether, if so, the determination of the trial court would have been overturned. In any event, the petitioner was able, after conviction, to present this issue before the appellate courts, and the issue was found to be without merit. Accordingly, the petitioner is unable to show any prejudice from the failure to seek appellate review.

Finally, the petitioner complains that his attorneys provided ineffective assistance when they failed to object to the State's repeated references to his prior felony conviction for purposes other than proof of the elements of the felon-in-possession charge.  This Court does not agree.  A review of the state court record does not reflect improper references by the State to the petitioner's prior conviction.[4]

D.    *Failure To Object To The Use Of The Petitioner's Prior Felony Conviction Twice In The Same Proceeding.*

In this assignment of error, the petitioner complains that his attorneys provided ineffective assistance when they failed to object to the State's improper use of his prior felony conviction, both to establish an essential element of the felon-in-possession offense and also to establish him as a second felony offender for purposes of enhancement of the sentence imposed on one of the counts of second degree murder.  The petitioner is mistaken in this regard. Whereas he is correct that the State may not utilize a single prior conviction both to establish guilt under the felon-in-possession statute and also to enhance the sentence given in connection with the *same* felon-in-possession charge, *citing State v. President,* 715 So.3d 745 (La. App. 3d Cir.), *writ denied,* 729 So.2d 590 (La. 1998) (noting that "the State cannot support a habitual offender bill of information ... against a person who is convicted under the firearm statute by using the same felony conviction that supported the [firearm] offense in the bill of information"). Instead, the State properly established the elements of the felon-in-possession count through proof of the petitioner's prior felony conviction and subsequently sought to enhance his sentence

---

4.  Although the petitioner asserts that the State "was allowed to compare and contrast" the criminal record of the petitioner with the absence of any criminal record of the purported accomplice, it does not appear that there were any direct comparisons between the two records. *See* Rec. Vol. II at pp. 477, 485-87, 491, 493-4.

in connection with the *separate* attempted murder count through proof that the petitioner was a second felony offender.  This was not improper, and the petitioner is unable to show any prejudice resulting from his attorneys' failure to object thereto.  *See State v. Bias*, 63 So.3d 399 (La. App. 3d Cir.), *writ denied*, 75 So.3d 939 (La. 2011) (finding no impropriety in the use of the same prior convictions "only once to support Defendant's conviction as a felon in possession of a firearm and only once to enhance Defendant's sentence for attempted armed robbery").

E.       *Failure To File A Motion to Suppress The Identification Of The Petitioner By Charles Collins.*

         The record reflects that on the night of the charged offenses, June 22, 2002, sheriff's detectives went to the hospital to question one of the victims, Charles Collins, and showed him a photographic lineup which included a photograph of the petitioner.  Mr. Collins was unable at that time to identify the petitioner as the person who had shot him.  Notwithstanding, Mr. Collins was thereafter present in the courtroom on February 17, 2003, the day prior to commencement of trial and almost eight months after the incident, and he observed the petitioner sitting in the courtroom jury box with several other people, and not in the company of his defense attorneys. At that time, Mr. Collins became convinced that the petitioner was the person who had shot him, and he unilaterally approached the prosecutor and advised that he was 100% certain that the petitioner was the guilty party.  Mr. Collins thereafter testified to this effect at trial.  The petitioner complains, however, that his attorneys should have filed a motion to suppress this testimony or should have at least objected to the testimony at trial, and that it was defective performance for them not to have done so.

         The Court does not agree with the petitioner's contention.  Although the identification testimony provided by Mr. Collins was devastating to the defense, the petitioner points to no

legal or factual basis for the exclusion of Mr. Collins' identification or testimony.  The United

States Supreme Court has stated "that reliability is the linchpin in determining the admissibility

of identification testimony" under the Due Process Clause."  *Manson v. Brathwaite*, 432 U.S. 98,

114 (1977).  A two-step procedure is utilized in evaluating such testimony, asking "first whether

the identification procedure was impermissibly suggestive and second, whether the procedure

posed a 'very substantial likelihood of irreparable misidentification.'"  *United States v. Rogers*,

126 F.3d 655, 658 (5th Cir. 1997).  "If the answer to both questions is yes, the identification is

not admissible."  *Id.*  The five factors utilized in evaluating the likelihood of misidentification

are "the opportunity of the witness to view the criminal at the time of the crime, the witness'

degree of attention, the accuracy of the witness' prior description of the criminal, the level of

certainty demonstrated by the witness at the confrontation, and the length of time between the

crime and the confrontation."  *Neil v. Biggers*, 409 U.S. 188, 199 (1972).  Further, the

availability of cross-examination "exposes to the jury the method's potential for error" and

substantially lessens the risk of misidentification.  *Simmons v. United States*, 390 U.S. 377, 384

(1968).

　　　　In the instant case, there is no credible suggestion that there was any prosecutorial

misconduct or suggestive procedure utilized by the State which led to Mr. Collins' identification

of the petitioner as the shooter.  When Mr. Collins was present in the courtroom on the day prior

to trial, he had not anticipated that the petitioner would also be present, and the petitioner was

not seated in a part of the courtroom or with persons whose presence would have suggested that

he was the guilty party.  Although the petitioner suggests that family members who accompanied

Mr. Collins may have pointed out the petitioner, there is no support for this speculative

17

contention.  Further, in evaluating the five identification factors noted above, the Court does not find "a very substantial likelihood of irreparable misidentification."  Mr. Collins testified that on the night of the shooting, he looked directly into the petitioner's face from a distance of approximately ten (10) feet, while the petitioner was pointing a rifle at the witness' head.  Mr. Collins' testimony was also that he was 100% certain that the petitioner was the person who had committed the offense.  Finally, Mr. Collins' description of the petitioner on the night of the shooting was essentially consistent with the petitioner's appearance, and the petitioner's attorneys were able to point out inconsistencies in that description on cross-examination, such as the degree of darkness of the petitioner's complexion and the length of his hair.  In addition, the petitioner's attorneys vigorously cross-examined Mr. Collins relative to his identification of the petitioner, noting the witness' inability to identify the petitioner's photograph on the night of the incident, the length of time since the incident had occurred, the fact that the witness may not have been wearing his prescription eyeglasses at the time of the offense, and the fact that the witness had been drinking earlier in the evening.  In short, the Court does not find that the petitioner has made a substantial showing of the denial of his constitutional rights in connection with Mr. Collins' identification or in the failure of the petitioner's attorneys to suppress that identification or to object thereto.

F.   *Failure To Move For a Mistrial Or Accept An Offer Of Mistrial Made By The Trial Judge After The Petitioner Was Observed By Jurors In Shackles And Handcuffs During A Trial Recess.*

Finally, the petitioner complains that during a recess in the trial, he was led through the jury room by a bailiff, and "several" of the jurors briefly observed him at that time in handcuffs and leg shackles.  The record reflects that the trial judge thereafter convened a meeting with

18

counsel and subsequently made a statement on the record regarding the results of that meeting. Although the petitioner asserts that the trial judge offered to grant the petitioner a mistrial, the record does not reflect such an offer. Instead, the judge noted on the record that neither the State nor the petitioner, after conferring with counsel, "requested any type of instruction to the jury." The petitioner asserts, however, that his attorneys should have accepted a proffered offer of a mistrial or should have themselves moved for a mistrial.

As a general rule, the shackling of a criminal defendant in front of a jury is prohibited unless "'justified by an essential state interest' – such as the interest in courtroom security." *Deck v. Missouri*, 544 U.S. 622, 624 (2005). Specifically, "[i]f a court erroneously shackles a defendant, the jury receives a powerful image contradicting the presumption of innocence." *Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009). "However, on collateral review of a state court conviction, federal courts apply a more lenient standard, only granting a writ when an error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id., quoting Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

In the instant case, assuming the petitioner's allegations to be true, the jurors observed the petitioner in restraints only briefly. Whereas criminal defendants are entitled to the physical indicia of innocence during jury trials, it has often been held that "brief and inadvertent exposure to jurors of defendants in handcuffs is not so inherently prejudicial as to require a mistrial, and defendants bear the burden of affirmatively demonstrating prejudice." *United States v. Decidue*, 603 F.2d 535, 549 (5th Cir. 1979). *See also White v. Johnson*, 111 F.3d 892, *8 (5th Cir. 1997), and cases cited therein. The petitioner has made no showing of prejudice in this case, and it is clear that his attorneys concluded, after a conference before the trial judge and after conferring

with their client, that no limiting instruction or other action should occur.  This Court will not second-guess this sound exercise of the petitioner's attorneys' judgment.  Accordingly, this assignment of error should be denied.

The Petitioner's Claim Regarding the Trial Court's Failure<br>to Sever The Felon-In-Possession Count Is Without Merit

As previously noted, a Motion to Sever was filed on the petitioner's behalf prior to trial, and the trial court denied the motion after a hearing.  In this regard, it has been stated that "[s]everance is within the discretion of the trial court and is required only in cases of compelling prejudice."  *United States v. MacIntosh*, 655 F.2d 80, 84 (5th Cir. 1981).  "The burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed by a reviewing court."  *United States v. Abshire*, 471 F.2d 116, 118 (5th Cir. 1972).  In addition, "[a] number of cases before [the Fifth Circuit] have upheld the denial of severance even when one of the charged offenses involves proof of a prior felony."  *Breeland v. Blackburn*, 786, F.2d 1239, 1241 (5th Cir. 1986).

Under Louisiana law, "the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute."  La. Code Crim. P. art. 61.  Specifically, "[t]wo or more offenses may be charged in the same indictment or information ... if the offenses charged ... are of the same or similar character or are based on the same act or transaction."  La. Code Crim. P. art. 493.  Notwithstanding, "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires."  La. Code Crim. P. art. 495.1  In determining whether to grant relief on a motion to

sever the trials of multiple offenses, Louisiana trial courts are directed to take into account

certain factors, including:

> (1) whether the jury would be confused by the various counts; (2) whether the jury would
> be able to segregate the various charges and evidence; (3) whether the defendant would
> be confounded in presenting his various defenses; (4) whether the crimes charged would
> be used by the jury to infer a criminal disposition; and (5) whether, especially
> considering the nature of the charges, the charging of several crimes would make the jury
> hostile.

*State v. Lomax*, 35 So.3d 396, 401 (La. App. 4th Cir.), *writ denied*, 51 So.3d 2 (La. 2010), *citing*

*State v. Washington*, 386 So.2d 1368, 1371 (La. 1980).

In the instant case, the trial court took into account the relevant factors and concluded

that the potential for prejudice could be ameliorated by a curative instruction.  The evidence

thereafter introduced at trial relative to the petitioner's prior felony conviction was limited to

testimony by a single person for purposes of identification and two pages of documentation

establishing the petitioner's conviction of the prior felony offense, with no information presented

to the jury regarding the details of the prior offense.  The trial judge gave limiting instructions to

the jury both immediately after the presentation of the referenced evidence and also at the

conclusion of the trial, advising the jury that consideration of the evidence was to be limited to

determining whether the elements of the felon-in-possession offense were satisfied.  Based upon

this showing, the reviewing state courts found no error in the trial court's decision, and this

Court finds no error in this determination.

In the case relied upon by the petitioner to support severance, *United States v. McCarter*,

316 F.3d 536 (5th Cir. 2002) (involving an appeal of a federal conviction and so involving a

notably different standard of review), the Fifth Circuit reversed a conviction obtained after a jury

trial which included a non-severed felon-in-possession count.  In reversing the conviction in that

case, the Court questioned the Government's good faith in joining the offenses, notably because (1) the felon-in-possession charges had not been included in the original indictment and were only added at a later point and only after the petitioner had moved to exclude evidence of the prior conviction and firearms possession, (2) the government later dismissed, without prosecution, one of the firearms counts that had in fact been severed by the trial court, (3) the evidence against the petitioner on the other counts was extremely weak, and (4) the petitioner was ultimately acquitted by the jury in connection with the joined felon-in-possession count. None of these factors are readily apparent in the instant case, and the *McCarter* case has been distinguished where such factors, or where other indications of questionable motivation on the part of the government, have not been present. *See United States v. Davis,* 2003 WL 1904039, *6 (E.D. La. April 16, 2003) (reiterating the general rule that, in most instances, a limiting jury instruction "is sufficient to cure potential prejudice from felon-in-possession counts, barring circumstances that would make limiting instructions insufficient"). Further, even if this Court were to second-guess the state court's determination in light of the purported weakness of the State's case against the petitioner at the time of the court's ruling on the Motion to Sever, the State's case had become substantially stronger by the time of trial because Charles Collins had come forward to provide additional identification testimony. Accordingly, the state court did not commit constitutional error in concluding that the limiting instructions to the jury would offset the potential prejudicial effect of the joinder of the offenses for trial.

The Petitioner's Claim Regarding The<br>
<u>Sufficiency Of The Evidence Is Without Merit</u>

The standard for testing the sufficiency of the evidence on federal habeas review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Knox v. Butler*, 884 F.2d 849, 851 (5th Cir. 1989). This standard of review applies in both direct and circumstantial evidence cases. *Schrader v. Whitley*, 904 F.2d 282, 287 (5th Cir. 1990). In reviewing the sufficiency of the evidence under this standard, the federal habeas court must defer to the state court fact-finder's evaluation of the credibility of witnesses and the resolution of conflicts in the evidence. *Knox v. Butler, supra,* 884 F.2d at 851. *See also Galvan v. Cockrell,* 293 F.3d 760, 764 (5th Cir. 2002); *Hosey v. Goff,* 2013 WL 1500883, *2 (S.D. Miss. March 11, 2013). Further, the federal habeas court's consideration of the sufficiency of the evidence is limited to a review of the record evidence adduced at the petitioner's state court trial. *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005); *Knox v. Butler, supra*, 884 F.2d at 852, n.7. State law determines the substantive elements of the offense in question, and a state judicial determination that the evidence was sufficient to establish the elements of the offense is entitled to great weight on federal habeas review. *Dickinson v. Cain*, 211 F.3d 126, *5 (5th Cir. 2000); *Hawkins v. Lynaugh*, 844 F.2d 1132, 1134 (5th Cir. 1988).

The petitioner first contends that the evidence was insufficient to support his felon-in-possession conviction, specifically because no evidence was introduced to show specifically that the 10-year cleansing period provided by statute had not elapsed between his prior felony conviction and the date of the alleged offenses. In this regard, La. R.S. 14:95.1 provides that the state prohibition against being a felon in possession of a firearm is not applicable to any person "who has not been convicted of any felony for a period of ten years from the date of completion of sentence, probation, parole, or suspension of sentence." Notwithstanding, as found by the

state appellate court in this case, evidence was introduced at trial to show that the petitioner pleaded guilty to armed robbery on June 15, 1992, and was sentenced to serve fifteen years at hard labor, without the benefit of parole, probation, or suspension of sentence.  Thus, although the petitioner had obviously not served the full term of his sentence in actual physical confinement (because he was not so confined on the date of the alleged offenses), his freedom was readily explained by his release under the Louisiana good-time statutes, which provide for the release of an inmate as if on parole upon his having served a percentage of his sentence on good behavior.  By statute, however, such inmates continue to be subject to the supervision of the parole board until their full term date.  Accordingly, as found in *State v. Jefferson*, 2008 WL 8919942, *7 (La. App. 4th Cir. Sept. 24, 2008), the proof of the petitioner's date of conviction, combined with the length of his sentence (which as here was to be served without the benefit of parole, probation or suspension of sentence), together with "the impossibility of being discharged therefrom prior to completion of the original sentencing date," was sufficient to satisfy the burden of proof relative to the applicable cleansing period.  Moreover, the determination in the *Jefferson* case was thereafter upheld on federal habeas review in the Eastern District of Louisiana.  *See Jefferson v. New Orleans Criminal District Court, Division F*, 2011 WL 6001866 (E.D. La. Nov. 30, 2011).  Accordingly, there was adequate evidence presented to support the felon-in-possession conviction, and this claim should be rejected.

The petitioner also asserts that the evidence was insufficient to support his convictions for attempted second degree murder.  Specifically, he points to inconsistencies in the testimony adduced at trial, to the inherent unreliability of the identification testimony of Charles Collins and to the inherent lack of credibility of the testimony of the purported accomplice who placed

24

him at the scene of the offenses.

In Louisiana, second degree murder is defined as "the killing of a human being ... when the offender has a specific intent to kill or to inflict great bodily harm," La. R.S. 14:30.1.  To establish guilt in connection with the offense of attempted second degree murder, it is necessary for the jury to conclude that the defendant had the specific intent to kill.  *State v. Bishop*, 835 So.2d 434, 437 (La. 2003).  Specific intent may be inferred from the circumstances surrounding the offense and from the conduct of the petitioner.  La. R.S. 14:10; *State v. Draughn*, 950 So.2d 583, 592-93 (La.), *cert. denied*, 552 U.S. 1012 (2007).

The evidence adduced at trial revealed that the petitioner, his brother Darrell Hamilton, and two companions, Herbert Sanders and Cedric Chambers, were at a nightclub on the evening of June 21, 2002, and became involved in a physical altercation with another group, during which altercation the petitioner's brother was badly injured and Herbert Sanders received a head wound.  The petitioner's group then left the nightclub and went to the home of the petitioner's girlfriend.  Shortly thereafter, a decision was made to take the petitioner's brother to the hospital. As a result, Chambers and the petitioner's brother left in one vehicle, and the petitioner and Sanders stayed behind, presumably to follow in a separate vehicle.  According to Sanders, he and the petitioner then drove in Chambers' red truck – with the petitioner driving – to a location where the petitioner obtained a firearm, and then to the residence of Alfred Robbins, who was one of the people with whom the petitioner and his companions had fought earlier in the evening. According to Sanders, the petitioner drove slowly past the residence, stopped the truck, and exited the vehicle with the firearm, after which Sanders heard the sound of shooting.  According to Sanders, the petitioner then returned to the vehicle and drove Sanders to the hospital where the

petitioner's brother was receiving treatment and where Sanders sought treatment for his own injuries.

In addition to the foregoing, several persons who were present at the residence where the shooting occurred testified that they observed a red truck with a loud muffler and two occupants pass slowly in front of the residence in the early morning hours of June 22, 2002. Charles Collins, who resided at that address, got into his car and drove to investigate. A short way down the block, Collins observed the petitioner approach on foot, point a rifle at Collins' head, and fire. Although the first shot missed, a second shot was fired as Collins attempted to drive away, and that shot hit Collins, causing him to lose control of the vehicle and crash in a neighboring yard. Meanwhile, other people who were present at Collins' house heard the shots and then observed a man approaching the residence with a firearm, whereupon they retreated into the house. Numerous shots were then fired at the house, and one of the inhabitants, Najah Freeman, was struck and injured. Najah Freeman later informed investigating officials that she had recognized Herbert Sanders as the passenger in the red truck, and Herbert Sanders later identified the petitioner as the driver. As previously noted, although Charles Collins was not able to identify the petitioner from a photographic lineup on the night of the offense, he was later able to identify the petitioner as the shooter after observing the petitioner in court prior to trial.

On direct appeal, the Louisiana Court of Appeal for the First Circuit accurately summarized the evidence adduced at trial as follows:

> At about 2:30 a.m. on the morning of June 22, 2002, Charles Collins was awakened by his fiancee, Mary Robbins, at their Nashville Street home in East Baton Rouge Parish. Mary was alarmed because her son, Alfred, had come home bloody and then left again. She wanted to go and look for him. Charles and Mary went out to their front porch, joining Mary's daughter, Tracy, Tracy's friend who was visiting, Najah Freemen, and Tracy's young daughter Juanica. Tracy [Robbins] noticed a red truck with

a loud muffler pass by very slowly and noted that the muffler noise suddenly stopped after it had passed by.  Charles [Collins] left in his car to check on the red truck.  As he drove just a short distance down the street, defendant, on foot, crossed in front of his car, came toward the passenger window with an assault rifle in hand, and aimed it right a Charles [Collin]'s head from about 10 feet away.  Charles [Collins] looked him right in the face.  When the first shot fired by the defendant missed, Charles [Collins] sped up to get away.  The next shot came though the back passenger window, through the headrest, and hit Charles [Collins] in the back of the neck.  He heard at least one more shot fired before he lost consciousness, lost control of this car, and crashed into a gas meter between the homes of two of his neighbors.  When Charles [Collins] regained consciousness, he walked home to check on his family.  There he found everyone safe except Najah Freeman.  Paramedics responded, taking both he and Najah to the hospital.

Charles [Collins] described the shooter to the police that night as having a slim build, with a medium haircut.  At trial, he was unsure exactly what his assailant had been wearing, but he believed it was a white shirt.  He was unable to pick defendant out of a photographic lineup conducted shortly after the shooting.  However, he was able to positively identify defendant at trial as the man who shot at him.  He swore that he was 100% sure of his identification.  The prosecutor made it clear that Charles [Collins] saw defendant in court before the commencement of the trial seated with several other men in the jury box.  He was not seated with defense counsel and no one pointed him out as the defendant.  Nor was any suggestion made by anyone that defendant would even be in the courtroom at the time.  Charles [Collins] sought the prosecutor out when he saw the defendant and advised the prosecutor that he was certain the man he pointed out was the one who fired at him at close range with an assault rifle.

Najah Freeman testified that while she was visiting her friend Tracy Robbins the night of the shooting, Alfred Robbins came home bloody about 1:30 a.m., took a shower, and left.  Alfred's [Robbins]' car remained parked in front of the house because it was not in operating condition.  Najah [Freeman]'s boyfriend had gone out with Alfred [Robbins] earlier, but had not come home with him.  There was discussion about going to the nightclub "Bar Code" to look for him.  Najah [Freeman] saw a red truck pass by.  She recognized Herbert Sanders seated on the passenger side, because they had attended high school together.  Charles [Collins] left to check on the truck, and Najah [Freeman] heard shots fired.  She ran inside to call 911 but before she could place the call, she was shot in the arm.  She was also struck in the lip, back and buttocks.  Najah [Freeman] tried to duck down and hide as bullets kept coming, and she could hear someone trying to get into the house.  She did not see who was doing the shooting.  Photographs introduced into evidence showed the multiple bullet holes to the outside and inside of the residence, as well as Najah [Freeman]'s blood pooled near the sofa and in other places where she tried to avoid the barrage of gunfire.  Fortunately, the other adults, as well as five young children in the home that night, were not injured.  Najah [Freeman] required surgery on her arm and about 80 stitches to mend her bullet wounds.

Tracy Robbins, who was out on the porch with Najah [Freeman] and the others, also noticed the red truck pass by and thought it must have stopped around the corner since the sound of the muffler suddenly died.  As the truck passed the house very slowly,

27

she saw two men in the truck looking at her.  After Charles [Collins] drove off and got a few houses down the street, she saw a man cross the street in front of Charles [Collin]'s car, and she heard shots.  The she saw the same dark-complected man in a white tee shirt running toward her home.  She ran inside to try to hide the young children.  Tracy [Robbins] was unable to identify the assailant in photo lineups or at trial.

Herbert Sanders, III, testified to the events leading up to the shooting.  Earlier that night, he went to a nightclub called the "Bar Code" with the defendant, Cedric Chambers, and the defendant's younger brother, Darrell Hamilton.  There, Herbert [Sanders] and his friends got into a brawl with Alfred Robbins and few other men.  During the incident, Darrell [Hamilton] was wounded badly and Herbert [Sanders] sustained a gash on his head....  Herbert [Sanders] admitted that he might have threatened retaliation.

The four men left for the home of defendant's girlfriend to get medical attention.  Darrell [Hamilton], Cedric Chambers, and two young women left to take Darrell [Hamilton] to the hospital.  Only defendant and Herbert Sanders remained at the house at that point.  Cedric Chambers left the keys to his red truck with either defendant or Herbert Sanders and understood that those two men were supposed to follow them to the hospital.  According to Herbert [Sanders], he was slumped down with a towel over his head bleeding most of the time and did not see exactly where they were going.  He claimed that defendant, who was driving, made one stop, was out of the truck for a few moments, then threw something into the back bed of the truck.  He recalled that they next drove very slowly past Alfred [Robbins]'s house.  Herbert [Sanders] recognized Alfred [Robbins]'s car parked in front of Charles Collins's house, where Alfred [Robbins] lived with his mother and Charles [Collins].  Herbert [Sanders] looked at the people on the porch as they passed and defendant stopped the truck in a curve down the street.  Defendant jumped out and got a rifle from the back of the truck.  Defendant then got inside the truck, cocked the rifle, and put it down on the seat, Herbert [Sanders] touched it as he pushed it away from him.  Then defendant got out again with the rifle.  Herbert [Sanders] heard gunfire and saw a car run into a house.  He tried to start the truck to get away from the scene, but could not do so because he could not drive a standard transmission.  Defendant then threw the rifle into the back of the truck bed, got back into the truck, and they drove to the hospital.  Defendant dropped Herbert [Sanders] off and got into a car with a girl, telling Herbert [Sanders] not to say anything about what had happened.

In the meantime, Najah Freeman told police at the hospital that she recognized Herbert Sanders as a passenger in the red truck.  Officers learned that Herbert [Sanders] had arrived for treatment at the same hospital and confronted him about the incident.  Herbert [Sanders] initially denied knowing anything about the shootings.  He eventually told the police part, but not all, of the truth.  He confessed that he was with defendant at the time of the shootings.  Herbert [Sanders] gave a third taped statement which, he admitted on cross-examination, also contained untruths.  Herbert [Sanders] was charged with conspiracy to commit homicide, and the district attorney promised to recommend probation if Herbert [Sanders] testified against the defendant.

Herbert [Sanders] generally claimed no participation in planning or executing the shootings.  According to him, he was just a passenger who was afraid to do anything

28

much to stop defendant.  He denied knowledge of the origin and ownership of the assault rifle used in the incident.  He gave no testimony concerning anything defendant may have said at the nightclub during or after the brawl, at the home of defendant's girlfriend, or on the way to the scene of the shooting.  Herbert [Sanders] was significantly impeached on a number of details during cross-examination, but was adamant that defendant drove the red truck and was the shooter.  Herbert [Sanders] had no past criminal record.

Cedric Chambers testified that he was a close friend of Darrell Hamilton.  He left with Darrell [Hamilton] for the hospital, sitting in the back seat with him and trying to keep him awake in case he had sustained a concussion.  He denied any knowledge of the live rounds of ammunition found in his red truck.  He recalled that after the fight Herbert Sanders was mad, just like the rest of them, and had threatened, "we going to get you."

East Baton Rouge Police Department Deputy Nicole Compton investigated the crime scene.  She found several spent shell casings in the roadway near the home of Charles Collins and Mary Robbins, as well as three further down the street.  Fourteen spent casings were recovered, all 7.62 x 39 caliber casings.  Deputy Coleman next went to the hospital and inspected the red truck involved in the incident.  On the floorboard near the back of the doorframe on the passenger side of the truck, she found a live round of a 7.62 x 39 caliber bullet.  She found another live round in the bed of the truck.  Baton Rouge Police Lieutenant Chester Ladner testified that an AK-47 type assault rifle would have fired that type of bullet.  No fingerprints were found on any of the casings.  Herbert Sanders's fingerprints were found on the passenger side door of the red truck.

Defendant attempted to show that Herbert [Sanders] was likely the shooter and called Herbert [Sanders] as a witness.  Under cross-examination, Herbert [Sanders] denied telling friends that night that someone had to pay for the brawl and that he had to get back at them.  He also denied telling anyone that he had an assault rifle that he had purchased from his brother.

Don Dartez, an East Baton Rouge Parish Sheriff's Officer, testified that he interviewed Herbert [Sanders] at the hospital.  He confirmed that at first Herbert [Sanders] did not admit being involved in the shootings.  He spoke to Herbert [Sanders] again and Herbert [Sanders] admitted some involvement.  A videotaped statement was later taken.  Herbert [Sanders] said in his statement that he and defendant went to an address in the Glen Oaks area and picked up the rifle, which was then placed under the seat in the cab of the truck, rather than in the bed of the truck, as Herbert [Sanders] claimed at trial.  Herbert [Sanders] never indicated that he was the shooter.

Derrick Shawn Bradford testified that he saw Herbert [Sanders] around 1:30 a.m. on June 22, 2002.  According to Derrick [Bradford], Herbert [Sanders] knocked on the door and told him that he had been beaten up at "Bar Code."  He asked Derrick [Bradford] to come with him to do something about it.  Derrick [Bradford] refused to get involved.  He also testified that Herbert [Sanders] told him he bought a "chopper" assault rifle from his brother and he had seen Herbert [Sanders] with it in his car on another occasion.  The witness admitted on cross-examination that the first time he gave this information was to defense counsel the previous night.  He claimed that he heard, through defendant's younger brother, that his name was brought up in the case.  He then offered to speak with defense counsel.  Derrick [Bradford] described himself as a close

friend of the defendant, but was unable to call to mind anyone who could verify anything specific the two had done together in the recent past. It was also brought out that Derrick [Bradford] was with Cedric Chambers at the residence of defendant's brother, Darrell [Hamilton], the night before trial commenced.

In closing, defense counsel argued that the identification of defendant by Charles Collins was unreliable because Collins wore glasses, had been drinking, and had originally identified defendant as having hair longer than that shown in the picture taken when defendant was arrested that night. Defense counsel also suggested that the in-court identification was influenced by discussions with family members, who were with him when he first spotted defendant in the courtroom and picked him out as the assailant. Only the testimony of [Charles] Collins and Herbert Sanders placed defendant at the scene of the shootings. Defense counsel argued that the weapon used in the shootings belonged to Herbert Sanders and that Herbert [Sanders] went to Alfred [Robbins]'s home with someone other than the defendant. That person, he suggested, fired the shots that wounded Charles [Collins] and Najah [Freeman]. He insisted that Herbert [Sanders] fingered defendant to save himself and because he feared the true shooter.

The prosecutor responded, pointing out that defendant and Herbert [Sanders] were the only persons left at the home of defendant's girlfriend when Cedric Chambers and Darrell [Hamilton] left for the hospital. Another person was seen with Herbert [Sanders] driving the red truck. The prosecutor argued that it was unreasonable to believe that Herbert [Sanders] left in Cedric [Chambers]'s truck and enlisted someone other than the defendant to drive to the scene and accomplish the shooting in the time that elapsed between Darrell [Hamilton] and Cedric [Chambers] leaving for the hospital and Herbert [Sanders] arriving there. He also argued that if the jurors believed that defendant was in the red truck, under the law of principals, it did not matter who the shooter was.

*See* State Court Record.

In the present case, the principal contested issue at trial was that of identification of the petitioner as being present and as being the shooter on the night of June 22, 2002, with the petitioner being placed at the scene only by the testimony of Charles Collins and Herbert Sanders. With regard to witness Collins, the petitioner emphasizes the witness' inability to pick the petitioner out of a photographic lineup on the night of the offense, yet his ability, with purported 100% certainty, to identify the defendant as the shooter after seeing the defendant sitting in the courtroom the day before trial. The petitioner also contends that witness Collins was not wearing his prescription eyeglasses at the time of the shooting and had been drinking

alcohol earlier in the evening.   With regard to witness Sanders, the petitioner points out the many admitted untrue statements made by this witness, the inconsistencies in various prior statements, and the witness' clear incentive both to incriminate someone other than himself as the shooter and also to obtain beneficial consideration from the State in connection with his own prosecution.  Notwithstanding, it is not this Court's function to determine what the jury could have found if only it had viewed the evidence differently.  Instead, the Court's role is to determine whether the evidence, viewed in a light most favorable to the prosecution, was sufficient to prove every element of the crime beyond a reasonable doubt.  Further, as noted above, this Court is limited to determining whether the Louisiana courts unreasonably applied the due process standards of *Jackson v. Virginia, supra*, in affirming the petitioner's conviction.

The credibility of witnesses is a factual determination and under 28 U.S.C. § 2254(e)(1), a determination of a factual issue shall be presumed to be correct.  The petitioner has the burden of rebutting this presumption of correctness by clear and convincing evidence.  In light of this standard, the Court finds no unreasonable application of *Jackson v. Virginia* and the Due Process Clause.  Viewing the evidence in the light most favorable to the prosecution, the jury could have believed, as found by the state trial court, that the petitioner was at the scene of the offense and was the person who fired the assault rifle at Charles Collins and into the residence where Najah Freeman was struck and injured, and that these actions were undertaken with the specific intent to kill.  Accordingly, based upon the foregoing, this Court is unable to conclude that the state courts unreasonably applied the Due Process Clause and *Jackson v. Virginia, supra*, and the petitioner's contention is without merit relative to this claim.

31

The Petitioner's Claim Regarding
<u>The Defectiveness Of The Indictment Is Without Merit</u>

Finally, in a Supplement to his original habeas corpus application (Rec. Doc. 32), the petitioner has added an additional claim regarding the alleged insufficiency of the Felony Bill of Information in this case, specifically because the Bill of Information refers only to an attempt to commit second degree murder of the "inhabitants" of a residence.   This claim is not properly before the Court.  In the first place, although the petitioner asserts in the referenced Supplement that the trial court erred in its "adjudication of his Motion to Quash the Bill of Information," the record reflects that no such motion was ever filed.  Moreover, this new claim has been asserted in a supplemental pleading filed long after the conclusion of the one-year period allowed for the filing of federal habeas corpus claims, *see* 28 U.S.C. § 2244(d)(1).  Accordingly, inasmuch as this claim of purported error committed by the trial court (in accepting the defective Bill of Information) is qualitatively different from the claim asserted in the petitioner's original application (of purported ineffective assistance of counsel in failing to move to quash the Bill of Information), this new claim is not seen by the Court to relate back to the initial filing thereof. *See Mayle v. Felix*, 545 U.S. 644, 650 (2005) (holding that an amended habeas corpus application does not relate back to the date of initial filing if it asserts "a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth"). Accordingly, a consideration of this claim is foreclosed by reason of untimeliness.  And in any event, this Court has already substantively addressed this claim, *supra,* in the context of the alleged ineffectiveness of the petitioner's counsel in failing to move to quash the Bill of Information, and has found the claim to be without merit.  Accordingly, this claim is also subject to dismissal.

32

Certificate of Appealability

Pursuant to statute, an appeal may not be taken to the federal court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Although the petitioner has not yet filed a Notice of Appeal, this Court may nonetheless address whether he would be entitled to a certificate of appealability.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), *quoting Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In the instant case, the Court finds that reasonable jurists would not debate the denial of the petitioner's § 2254 application or the correctness of the district court's ruling.  Accordingly, it is appropriate that, in the event that the petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

RECOMMENDATION

It is recommended that the petitioner's application for habeas corpus be denied, and that this proceeding be dismissed, with prejudice.  It is further recommended that, in the event that the petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

Signed in Baton Rouge, Louisiana, on February 4, 2014.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

33

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**THOMAS HAYNES, JR. (#308610)**                                    **CIVIL ACTION**

**VERSUS**

**BURL CAIN, WARDEN**                                               **NO. 11-0202-SDD-RLB**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein.  Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on February 4, 2014.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**